Filed 5/1/13  P. v. Seymore CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM RAY SEYMORE,<br><br>        Defendant and Appellant. | A129678<br><br>(Humboldt County<br> Super. Ct. No. CR1001212<br><br>**ORDER MODIFYING OPINION**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

The opinion filed herein on April 12, 2013, is modified as follows:

On page 19, at the end of line 9, ending with the citation to *People v. Dennis* (1998) 17 Cal.4th 468, add the following footnote:

In apparent anticipation that we would determine that the claimed prosecutorial misconduct was more extensive than we have, defendant asks that we take judicial notice of an unpublished opinion by this court where we concluded that the same deputy district attorney who prosecuted this case had committed prejudicial misconduct in a different case.  In light of our conclusion that the claimed misconduct here was not prejudicial, defendant's request is denied.

This modification does not effect a change in the judgment.


Dated: _____                    _____

                                                                    Acting P.J.

1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM RAY SEYMORE,<br><br>　　　Defendant and Appellant. | A129678<br><br>(Humboldt County<br>Super. Ct. No. CR1001212) |

　　　A jury found defendant William Ray Seymore guilty as charged of possessing a sawed-off shotgun (Pen. Code, former § 12020, subd. (a)(1)), following which defendant admitted an allegation that he had a prior felony conviction (Pen. Code, § 667.5, subd. (b)). The trial court sentenced him to state prison for a total term of three years. On this timely appeal, defendant presents claims of trial court error in: (1) allowing the admission of impermissible evidence; (2) permitting prosecutorial misconduct; (3) and instructing the jury improperly. Defendant also contends that he did not receive the constitutionally-guaranteed benefit of the assistance of effective counsel. We conclude that no prejudicial error occurred during defendant's trial, and therefore affirm the judgment of his conviction.

**BACKGROUND**

　　　The relationship between defendant and Holly Upshaw had once been cordial. It started when they were introduced by Upshaw's fiancé when he, the fiancé, was in prison. According to Upshaw, defendant "became my caretaker while my fiancé was in prison." "We pretty much did everything together." They lived together in their cars,

1

which they often parked at the Blue Heron motel. But eventually their relationship began to fray. "We started bickering like a married couple because we were around each other all the time." On the evening of February 24, 2010, Upshaw and defendant quarreled before she left the Blue Heron to get gas for her car. Defendant followed in his pickup truck.

That evening, Marion Thom, the manager of a Texaco station in Eureka, observed a man and a woman arguing in a nearby parking lot. The man got into a pickup, backed into a car being driven by the woman, and then drove away. Thom had already called 911 when the woman, Upshaw, came into the station office. Thom gave the telephone to Upshaw, who told the operator that it was defendant who had struck her car. Upshaw reported that she and defendant had been fighting, that defendant had demanded money from her, and that he was headed to the Blue Heron motel in his pickup, which Upshaw described. When the operator asked whether defendant was armed, Upshaw replied that defendant kept a sawed-off shotgun under the seat of his pickup, and that she had seen it there the day before. The tape of the 911 call was played for the jury.

After Upshaw finished speaking with the 911 operator, Thom showed her a security camera videotape. Upshaw testified that the tape accurately depicted the events in the parking lot. The videotape was also played for the jury.

Eureka Police Officer John Goodale talked with Upshaw at the gas station. He watched the hard drive recording of the security system from which the videotape was made. Upshaw described defendant's pickup ("a big, blue Chevy truck with Oregon license plates"), named defendant, and told Goodale that he would be at the Blue Heron motel. Goodale drove to the motel, and saw the pickup. Inside it he observed a shotgun, which he retrieved. The vehicle was unlocked, and the weapon could be plainly seen from outside. Goodale unloaded the weapon and put it in his vehicle. Defendant was found in one of the motel's rooms and arrested for possessing the shotgun.

Defendant did not testify. His defense, presented by the testimony of a friend, Louis Prado, was that a man who used to live next to Prado planted the shotgun in defendant's pickup.

2

Additional evidence will be discussed in connection with our resolution of defendant's claims of error.

## REVIEW

### The Trial Court Did Not Abuse Its Discretion In Admitting The 911 Tape And The Dispatcher's Testimony

Defendant moved in limine to exclude evidence of the 911 call initiated by gas station operator Thom and then continued by Upshaw. In his written motion, defendant argued that exclusion was appropriate because the statements made by Upshaw were more prejudicial than probative, did not qualify as an excited utterance (Evid. Code, § 1240), and could not satisfy the Confrontation Clause analysis specified in *Crawford v. Washington* (2004) 541 U. S. 36. Defendant's motion aimed at excluding not only the tape itself, but also testimony from the 911 dispatcher. The relevant portions of the tape are set out as an appendix to this opinion.

The trial court conducted an evidentiary hearing pursuant to Evidence Code section 402 at which it heard testimony from Marion Thom, Upshaw, and Michelle Reyna-Sanchez, the 911 dispatcher. Ms. Reyna-Sanchez and Ms. Thom did nothing more than authenticate the 911 tape. So did Upshaw, although she also testified that she was crying and "emotionally traumatized" while making the call. Upshaw also authenticated the station's security camera videotape.

At the conclusion of the hearing, the trial court ruled that the evidence would be admissible. Defendant attacks this ruling on several grounds. Before addressing those attacks, two preliminary remarks are in order.

First, although *Crawford v. Washington*, *supra*, 541 U. S. 36 was mentioned both in defendant's moving papers and in the trial court's ruling, it is neither cited nor discussed in defendant's briefs. No further mention of *Crawford*'s Confrontation Clause analysis is required.

Second, the record before us does not include the actual 911 tape. Without it, we cannot undertake an informed review of whether the trial court erred in concluding

3

Upshaw's statements were made in "the stress of excitement" (Evid. Code, § 1240, subd. (b)) that would authorize admission.

Defendant argues that evidence of the 911 conversation lacked relevance. This was not one of the grounds mentioned in defendant's moving papers, but it can be seen as included in defendant's arguments at the hearing. Defendant's relevance argument will therefore be deemed preserved for purpose of review.

Defendant argued at the hearing that "the 911 call lacks relevance as to whether Mr. Seymore was in fact in possession of a short-barreled shotgun." The court concluded that "the 911 tape is relevant to the element of the crime of possession and knowledge of the sawed-off shotgun." That ruling can be overturned on appeal only if we conclude the trial court abused its discretion in determining that the evidence was relevant. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805; *People v. Cox* (2003) 30 Cal.4th 916, 955.) We cannot so conclude.

At a minimum, the evidence was relevant, as the prosecutor stated, because "it puts Mr. Seymore in the blue truck," which is where the illegal weapon was located. Thus, the evidence was relevant in showing why Officer Goodale went to the Blue Heron motel and examined the particular truck that he did. It was because of what Upshaw told him that Goodale was on the look-out for a particular type of concealable weapon. The 911 tape was also relevant because Upshaw's statements to Ms. Reyna Sanchez corroborated what was on the security videotape.

The major part of defendant's argument for exclusion tacitly conceded relevance, while trying to demonstrate that it was outweighed by the prejudicial impact of the jury hearing the tape and therefore exclusion was appropriate under Evidence Code section 352. The trial court's rejection of this argument is also reviewed for abuse of discretion. (*People v. Jablonski*, *supra*, 37 Cal.4th 774, 805; *People v. Cox*, *supra*, 30 Cal.4th 916, 955.)

But defendant insists that the normal review cannot be had because the record does not establish that the court actually undertook the weighing process required by Evidence Code section 352. It is true that the trial court did not expressly recite that it

was conducting the weighing process, but that is not fatal. " '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352.' " (*People v. Hinton* (2006) 37 Cal.4th 839, 892.) We believe that recognition was present here.

As defendant put it in his moving papers: "The 911 tape is interrupted by a second call reporting a reckless driver. This segment of the call reports that a blue car with white fenders is . . . violating the Vehicle Code in a dangerous way. This portion of the call . . . could imply that it is the Defendant who is driving recklessly." Defendant termed it "misleading" and potentially confusing to the jury. After inviting the prosecutor "to address the . . . 352 objection," the court agreed with defendant and directed that "the part talking about the blue car will be excluded." It seems highly unlikely that having mentioned Evidence Code section 352 the court would neglect to perform the analysis demanded by that statute. Moreover, the court appeared to be sensitive to defendant's concern when it suggested that "the Court would be open" to a limiting instruction. We conclude that these circumstances are sufficient to establish that the trial court complied with the process of weighing relevance and prejudice required by Evidence Code section 352.

Defendant sees prejudice in Upshaw's statements on the tape that defendant: (1) "backed up and slammed into her car"; (2) "keeps coming after me" even though "Everybody knows I am pregnant"; (3) would get "even more mad" if she "get him caught up in that"; and (4) "will kill me" if he discovered "that I told you."

Defendant's analysis in his brief is larded with references to Evidence Code section 1101, a statute not mentioned in his moving papers or his argument at the hearing. By reason of that omission, the statute cannot be used for the first time on appeal. (*People v. Kennedy* (2005) 36 Cal.4th 595, 612; *People v. Clark* (1993) 5 Cal.4th 950, 988, fn. 13.)

We cannot conclude that the trial court abused the discretion granted it by Evidence Code section 352. Without the tape, and the corroborating testimony of Thom,

Upshaw, and Officer Goodale, the jury would have had no explanation as to why Officer Goodale went to the Blue Heron looking for defendant or the association between defendant and the pickup in which the shotgun was found. Jurors are not stupid. They would not accept that Officer Goodale simply showed up at a specific motel, looking for a specific person, who was driving a specific vehicle, and in possession of a specific type of weapon. The trail had to be shown, the dots connected. The 911 tape did that. As for the supposedly prejudicial aspects identified by defendant, the fact that defendant hit Upshaw's car, and her various expressions of why she was afraid of him, would logically explain why she called 911.

The matter of the tape's admissibility is the basis for two claims by defendant that he was denied his constitutional right to the effective assistance of counsel. He first argues that his trial counsel's performance fell below acceptable norms because she did not "press" the trial court to state for the record the court's reasoning on the balancing process required by Evidence Code section 352. It has already been established that such an analysis need not be recited for the record and, in any case, the court's reasoning can be discerned from this record. Having concluded that the trial court's analysis does not amount to an abuse of its discretion, the claimed omission by counsel would not qualify as prejudicial.

Defendant next submits that trial counsel incompetence is demonstrated by the limiting instruction she fashioned that was given to the jury. Defense counsel took up the trial court's suggestion and did submit a limiting instruction which read: "A videotape and a 911 recording were admitted into evidence. These items should only be considered in deliberations regarding: one, possession and control of the vehicle depicted and referenced as the case may be; and two, possession and control of the firearm located in said vehicle." Defendant now argues that this instruction demonstrates trial counsel's incompetence in that it was "inadequate because it does not address the issue of other bad acts or uncharged crimes or the trial testimony regarding the [Bridgeville] incident, and it fails to affirmatively instruct the jury that it cannot consider the other bad acts or uncharged crimes for propensity to commit the charged crime." We disagree entirely.

6

The instruction plainly advised the jury that the tapes could be used for two purposes and two purposes only. Implicit in the instruction is that the evidence could not be used for "propensity" as defendant now fears. This was certainly how defense counsel interpreted the instruction when she argued that the jury should "remember the judge has instructed you you're not to decide whether some disturbing of the peace or vandalism or something like that took place at the Texaco [station]."

As will be shown in the next section of this opinion, the jury did not learn of any "bad acts or uncharged crimes" concerning the Bridgeville incident. As for whatever "bad acts or uncharged crimes" might have arisen out of the incident in the Texaco parking lot, reasonable competent counsel could have made a rational tactical decision not to draw the jury's attention to specific possibilities the jury would then be told to ignore.

### Issues Relating To Possession Of The Shotgun On The Day Before The Charged Offense

Defendant was charged with possessing the prohibited shotgun "on or about" February 24, 2010. Yet it was also clear that defendant was in possession of the shotgun on the day before the date specified in the information. This issue of possession on February 23 underlies a number of issues in defendant's brief. We collect them here.

During her direct examination by the prosecutor, Upshaw was asked when she came to be aware of the shotgun. She responded: "When we used it the day before for protection. [¶] . . . [¶] I was in the truck with him [defendant]. We were headed past Bridgeville to go retrieve as stolen truck of his. [¶] . . . [¶] I didn't see it until it was brought out, and then it was in both of our possession." It was on February 23, 2010, the day before the events at the Texaco station and the Blue Heron motel, that Upshaw fashioned the stock for the shotgun in Bridgeville.

Further direct examination elicited answers that that on the 23rd defendant was going to Bridgeville "to find a vehicle that was stolen," and defendant did not "attempt to use the sawed-off shotgun." When the prosecutor asked whether defendant "express[ed] any intention as to what the shotgun was going to be used for," defense counsel objected

7

on the grounds of relevance and "352 also." At that point the jury was excused, so that defense counsel could "state . . . an expanded objection." Defense counsel then objected that the prosecutor's question "would call for Miss Upshaw's testimony as to any attempted crime of violence or use . . . of that shotgun at the incident in central Humboldt [County]. . . . I think it's extremely prejudicial to the defendant that the jury hear that he may have used that shotgun, especially, in light of the fact that Miss Upshaw has been given an immunity agreement and is admitting to aiding and abetting a violent crime. So that was my 352 objection. [¶] I would also object on relevance to the case-in-chief as of February 24, 2010, of whether Mr. Seymore was in possession of a short-barreled shotgun."

The prosecutor responded that defense counsel "was incorrect at bench. She received discovery on May 13 [i.e., yesterday]. At least that's the time stamp we have in Investigator Honsal's report. She [Upshaw is] not testifying to any of that, in any respect; that she's aiding and abetting a violent crime. . . . [¶] She did tell Investigator Honsal that they went to—Mr. Seymore confronted the man who stole his vehicle. Seymore beat him up bad. I didn't anticipate putting that in front of the jury. And he [defendant] wanted to threaten him with the shotgun, but she [Upshaw] wouldn't allow him access to the shotgun. I don't see how she's aiding and abetting any sort of violent crime, other than the defendant's violent crime which she was obviously not a party to." The prosecutor then suggested that "Upshaw would obviously need to be instructed that she cannot testify about uncharged bad acts."

The court ruled that Upshaw would be allowed to testify that she stopped defendant from using the shotgun, but without getting into "additional uncharged bad acts or crimes." Upshaw was instructed by the court as to what she could testify about and what she could not. Defense counsel also stated: "I guess problematically I will concede I did have discovery as to the incident—that we're talking about in this objection. Unfortunately, it's extremely hard from that discovery to determine what date that may have occurred. And, I'm sorry, Miss Upshaw may have already testified as to what date she thought that was. But I—I'm not clear. Clearly the information is on February 24."

8

The prosecutor confirmed that his questions "pertain[] to the day before."  The prosecutor further confirmed that further questioning would not encompass "a violent encounter between Mr. Seymore and another man."

In the presence of the jury, Ms. Upshaw then testified as follows:

"Q.  And at some point after you had fixed the handle to the shotgun, did Mr. Seymore attempt to possess it in any manner?

"A.  He tried to get it, yes.

"Q.  And, again, this was on the 23rd?

"A.  Yes.

"Q.  And can you describe how he intended to get it?

"A.  He reached to get it, and I kind of blocked him from grabbing it."

Defendant's first claim is that he was not provided discovery of information concerning the Bridgeville incident in a timely fashion, which amounted to prosecutor misconduct.  But defendant's trial counsel made no such claim.  As shown, she did concede "I did have discovery," and did not argue that its provision to her was untimely.  No claim of misconduct was ever presented.  The arguments defendant now make were therefore not preserved for review.  (*People v. Gray* (2005) 37 Cal.4th 168, 215; *People v. Kennedy*, *supra*, 36 Cal.4th 595, 612.)  Had the issues been preserved, defendant would not prevail.

The statute governing criminal disclosure mandates that it shall be provided "at least 30 days prior to trial . . . .  If the material and information becomes known to, or comes into possession of, a party within 30 days of trial, disclosure shall be made immediately . . . ." (Pen. Code, § 1054.7.)  Given that discovery had been made to the defense only the day before without protest by defense counsel that it was untimely, we must presume that the prosecution complied with the statute and made disclosure "immediately" after it became known to the prosecution.  (Evid. Code, § 664.)  Defense counsel's failure to request any sanctions is also significant circumstantial proof that the defense was not sandbagged.

9

Moreover, had a violation of the prosecution's discovery obligations been established, defendant could not establish prejudice. Defendant argues that "The Bridgeville incident was the only evidence that tended to show that appellant was in knowing possession of a short-barreled shotgun at any point in time. Therefore, it was a dominant part of the evidence against him. Admission of the evidence was prejudicial because defense counsel could not be expected to be able to respond to such inflammatory evidence, on such short notice, during trial." But Upshaw could—and did—testify to defendant's possession without getting into the details of what happened once she and defendant arrived in Bridgeville and confronted the suspected thief. It is therefore simply erroneous to state that the "Bridgeville incident was the only evidence" showing that defendant "was in knowing possession of a short-barreled shotgun at any point in time." Whatever may have been "inflammatory" about that incident was neutralized by the trial court's severe restriction of how it could be revealed to the jury.

Next, assuming that his trial counsel did receive discovery in a timely manner, defendant contends that trial counsel was constitutionally incompetent because she did not "investigate it, recognize its significance, and immediately move . . . to exclude it prior to the jury becoming aware of it." Exclusion is pretty much what the trial court did, without any prompting from counsel. The utterly bland fashion in which Upshaw told the jury of how she prevented defendant from getting his hands on the shotgun on February 23 appears equivalent to the same outcome trial counsel could have achieved had she acted as defendant now specifies. In other words, defendant has failed to demonstrate prejudice from any omission by his trial counsel.

Finally, the issue of possession of the shotgun on February 23 leads to a claim of instructional error by omission. Defendant points to an instance in which he claims the trial court failed to satisfy its sua sponte duty to instruct the jury on principles of law openly connected with the case. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085; *People v. Estrada* (1995) 11 Cal.4th 568, 574.)

Because the trial produced testimony that defendant had the shotgun on the day before the incident at the Texaco station, he contends the court ought to have given the jury a unanimity instruction.

The state Constitution guarantees criminal defendants a unanimous jury verdict on a specific charge. (Cal. Const., art. I, § 16.) When a conviction on a single charge could be based on evidence of two or more discrete criminal acts, all jurors must agree that the defendant committed the same act. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "When a defendant is charged with a single offense, but there is proof of several acts, any one of which could support a conviction, either the prosecution must select the specific act relied upon to prove the charge, or the jury must be instructed that all the jurors must agree that the defendant committed the same act or acts. [Citation.] When the prosecutor does not make the election, the trial court has a sua sponte duty to instruct the jury on unanimity." (*People v. Mayer* (2003) 108 Cal.App.4th 403, 418.)

Here the prosecution made that election. The information identified defendant as having committed the offense "on or about February 24, 2010." The following excerpts from the prosecutor's closing argument establish beyond any question that the prosecutor ignored Upshaw's disclosure about defendant's possible possession on the day before, and elected the date used in the information:

"So I think there's no dispute Mr. Seymore was at the gas station, and Mr. Seymore has the blue Chevy and that there was a shotgun in the Chevy. [¶] . . . [¶]

"So we have Miss Upshaw at the Texaco. And we have the argument which precipitates the 911 call. 911 is called, gets EPD Officer Goodale. Officer Goodale, if you recall, said that he was—his response time from the time of the 911 call to the time he went to the Blue Heron was approximately 10 minutes. At that time based on the description provided by Miss Upshaw and subsequently confirmed by defense witness Mr. Prado, Goodale finds this blue Chevy truck. Fearing for officer safety, he goes to the driver's side window, looks in. In plain view he sees the shotgun . . . . [¶] . . . [¶]

"[After the incident at the Texaco station], Mr. Seymore gets in the truck. It's his truck. You see on the video—he must have seen the weapon, reached behind the front

11

passenger seat, picked up the weapon, . . . put it . . . under the driver's side floorboard with the handle facing front.  If he did that, which is the only explanation for where the . . shotgun was located—I mean, that's the only reasonable explanation . . . [¶] . . . how a firearm would be able to make it from this area to this area would be if the person who got in the truck, who was driving the truck, moved it.  [¶] . . . [¶]

". . . I hope I made my point regarding the general intent nature of the crime.  We don't need to intend to use the firearm for a wrongful purpose.  You just have to possess it. . . . [¶] The 911 . . . call gets EPD properly to the Blue Heron, find the truck, . . . Mr. Seymore's truck.  That's where the shotgun was found.  [¶] . . . [¶]

". . . [L]et's just take the case since we're here.  On the 24th who had the shotgun?  Mr. Seymore, we allege, had this shotgun in his truck.  This was after Goodale talked to Upshaw to get his information, went to the Blue Heron, found the truck matching the description given by Miss Upshaw, subsequently identifying the vehicle and found the shotgun.  That's what we have.  We have Mr. Seymore's shotgun.  Mr. Seymore's vehicle at the Blue Heron.  This is on the 24th."

There was nothing in the prosecution's argument to suggest that it was relying on Upshaw's testimony about the shotgun's possession on the February 23.  Because the prosecution made a clear election to have the charge rise or fall on the evidence of defendant's possession on February 24, there was no sua sponte obligation on the trial court to give a unanimity instruction. (*People v. Mayer, supra,* 108 Cal.App.4th 403, 418; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455.)

Defendant contends his trial counsel was constitutionally incompetent because she did not "request the prosecution to make an election as to a particular instance of possession."  In light of the preceding analysis, this claim fails because defendant cannot establish prejudice from trial counsel's omission.

**Defendant Has Not Identified Any Prejudicial
Misconduct By The Prosecutor**

Defendant contends that the prosecutor's "pervasive pattern of misconduct" deprived him of his due process right to a fair trial.

12

The trial court closed his initial instructions to the jury with "Now that you have heard all the evidence as well as my initial instructions, we'll now hear arguments of counsel. Again, I'll repeat that closing arguments are not evidence. Because the People have the burden of proof, Mr. McLaughlin gets to . . . give an opening/closing and a final closing." The prosecutor commenced his closing argument as follows: "Good morning, ladies and gentlemen. I just want to piggyback on what the judge says. I'm going to use the phrase 'I think' a lot. What this is is my interpretation of what the evidence is. It's going to be up to you, the trier of fact, who decide. So my interpretations, as the Court said, . . . are not evidence, just my opinion."

Defendant sees this and other remarks as improper "vouching" for the prosecutor's view of the evidence and defendant's guilt. We do not have the same view, for the reasons stated in *People v. Pineiro* (1982) 129 Cal.App.3d 915, 924: "It is misconduct for a prosecutor to argue his personal opinion of a defendant's guilt or to intimate that he would not prosecute an innocent man. [Citation.] The prosecutor did not do this in the present case: examination of his arguments to the jury demonstrates that he was merely presenting his view of deductions and inferences warranted by the evidence. His use of the pronoun 'I' did not mean that he was impermissibly injecting his personal beliefs."

Next, defendant attacks the prosecutor for alluding to certain facts not in evidence. Defendant references three instances where the prosecutor made remarks about how he had not anticipated that Upshaw was going to claim that she "jointly possessed" the shotgun with defendant. Concerning Upshaw's testimony about jointly possessing the shotgun with defendant, the prosecutor was merely expressing his lack of foreknowledge. This hardly amounts to providing the jury with "information about his extra-record communications" with her, and thus "stating facts not in evidence" as defendant believes.

The prosecutor told the jury "I felt comfortable giving her [Upshaw] immunity." He immediately followed that with "She testified it was jointly theirs for protection of vehicles and their belongings. So she's guilty because in this crime all that's required is the possession." This hardly looks like vouching for her credibility, as evidenced by the prosecutor's earlier remarks: "Miss Upshaw was given an immunity agreement, and I

13

know that those aren't palatable to jurors. They're not palatable for prosecutors either. . . . As much as it stinks, quite frankly, it was necessary." None of the remarks elicited an objection from the defense or a request that the jury be admonished. By reason of this omission, the point was not preserved for review. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260; *People v. Gray*, *supra*, 37 Cal.4th 168, 215.)

Officer Goodale testified on defense cross-examination that when he encountered Upshaw at the Texaco station he thought she was under the influence of a controlled substance. The prosecutor argued that it was a "red herring" that Upshaw's credibility was somehow impaired because she was not arrested. Defendant attacks this as misconduct because there was no evidence that Upshaw was herself arrested at the Texaco station. But there was Upshaw's emphatic testimony that she was not under the influence. From that, the absence of an arrest seems a fair inference for the prosecutor to press upon the jury. Moreover, there was no misconduct because the prosecutor was literally correct—there was no evidence that Upshaw was arrested on February 24 for being under the influence.

Defendant sees the same kind of misconduct in the prosecutor's argument about Upshaw being an informer: "But Miss Upshaw is now, having testified against Mr. Seymore, a snitch. . . . She didn't want to get her friend at the Blue Heron who disclosed where Mr. Seymore was in trouble. She didn't want to make her friends snitches. She's already a snitch." The jury knew that Upshaw was testifying against her will, pursuant to an immunity agreement, and that she had a pending charge of possessing methamphetamine for sale. The commonly-known 'snitch" designation thus comes within fair comment. But Upshaw did *not* testify about a "friend at the Blue Heron." To that extent, the prosecutor did go beyond the evidence or reasonable inference. However, there was no defense objection to preserve the point for review. (*People v. Virgil*, *supra*, 51 Cal.4th 1210, 1260; *People v. Gray*, *supra*, 37 Cal.4th 168, 215.) " 'In the absence of a timely objection the claim is reviewable only if an admonition would not have otherwise cured the harm caused by the misconduct.' " (*People v. Hinton, supra,*

14

37 Cal.4th 839, 863.) Because the type of alleged misconduct here would have been cured by an admonition, the forfeiture rule still applies.

The next instance of claimed misconduct must take account of prior remarks by defense counsel who not so subtly insinuated that the shotgun was Upshaw's and that she arranged to have it found in circumstances that would incriminate defendant: "What more likely happened is that . . . the sawed-off shotgun was put into the truck only after Holly Upshaw asked that it be. [¶] . . . [¶] It is possible that this is Miss Upshaw's sawed-off shotgun. And after she's talked to Eureka Police, she may realize while she's on the phone—again, she doesn't mention the weapon until the very end of the 911 call. She may realize that the police will descend on the Blue Heron very quickly and that they may, in fact, find her gun. So she has two motives to lie and two motives to lie both to the police and in court to protect herself . . . and to get Mr. Seymore out of her hair. [¶] . . . [¶] I think it's ended up very convenient for Holly Upshaw that she was given immunity for her drug dealing and that she was then able to come up here and say— basically admit her own possession of . . . the sawed-off shotgun and not get prosecuted for that, get William Seymore prosecuted for that."

In response the prosecutor argued that the defense argument "makes no sense because Miss Dixon's theory is that she's calling to have . . . the police find the gun. So, if the gun wasn't in the truck, it would have been safer for Holly Upshaw to say she didn't see a gun. The police wouldn't have found it. They didn't have a search warrant. They looked in the truck. Wasn't there, it wasn't there. Never come back to Holly." The prosecutor also told the jury that "What Miss Dixon told you is actually factually incorrect. She [Upshaw] has no immunity for testimony in this case."

Defendant contends that the prosecutor's remarks were misconduct because "[t]here when no evidence that the police did not have a search warrant. Nor was there any evidence about what would have happened if the police did not locate the shotgun in the truck. The prosecutor was merely speculating that they would not have gone back to Holly and eventually connected her to the shotgun." With respect to the shotgun, it is now defendant who is relying on the absence of evidence. The prosecutor was

15

proceeding on the reasonable assumption that the police, connecting defendant only with the truck that might be at the Blue Heron, would restrict their search to the truck, there being otherwise no reason to connect defendant with one of the rooms at the motel. Nor do we discern an attack on defense counsel's integrity when the prosecutor noted that defense was "factually incorrect" about the scope of Upshaw's immunity, particularly when defendant acknowledges that defense counsel had "misstated the facts."

Defendant sees misconduct in the prosecutor arguing the state of Upshaw's vehicle when she was subsequently arrested. But defendant concedes "the only person to testify about these things was Holly," without realizing that this means that the prosecutor was *not* misstating the evidence, and thus not committing misconduct.

The sole defense witness, Louis Prado, ended his direct examination by responding "not that I'm aware of" when asked whether he had been convicted of a felony. The prosecutor made this issue the start of his cross-examination:

"Q. Mr. Prado, what's your date of birth, please?

"A. 7/24/58.

"Q. Thank you. And are testifying you don't have a conviction for Health and Safety Code 11379 [possession for sale]?

"A. Well, if this is about me, I don't know exactly what my arrest record's about. I haven't been in any trouble in a good while.

"Q. Okay.

"A. And as far as remembering, I'm not sure about the dates and everything and what convictions I have. I have had Safety—Health and Safety convictions, yeah, sure, paraphernalia.

"Q. Methamphetamine.

"A. Excuse me?

"Q. Methamphetamine related?

"A. I've been caught with some, yes.

"Q. Okay. Could that be the genesis of your conviction for Health and Safety Code 11379, if you remember?

16

"A. Well, I know that that's one of the—I don't know if it's mine or what—I can't be sure?

"Q. Okay. So your memory is a little fuzzy?

"A. What you're talking about? I told you I've had a couple runs with meth, yeah. The dates and what I've been convicted on, I don't know. We're talking about me."

Defendant calls this misconduct because the prosecutor was assuming a fact not in evidence—Prado's felony conviction. But what is perfectly obvious is that Prado did have a felony conviction and everybody knew it. If we had a reporter's transcript of all the pretrial proceedings, we are virtually certain we would find an in limine motion asking the court to rule on whether Prado could be impeached with a felony conviction. We are equally certain that the court ruled that Prado could be so impeached. Defense counsel tried to draw the sting by introducing the subject herself. But Prado, either from nervousness, genuine memory loss or some other motive, departed from the script and denied what both counsel and the court knew to be the demonstrable reality. Only this explains the silence of the court and defense counsel during the prosecutor's cross-examination. If these presumptions are incorrect, the claimed misconduct could have been cured by admonition had defense counsel objected. (*People v. Hinton*, *supra*, 37 Cal.4th 839, 863.)

The prosecutor argued "We have Mr. Goodale—Officer Goodale who actually viewed the image from the hard drive at the Texaco, not just a video of a video that we were fortunate or unfortunate enough to get. And he picks out Mr. Seymore's clothing as matching the clothing Mr. Seymore was wearing at the Blue Heron when he was arrested." Defendant calls this misconduct because "[t]here was . . . no evidence that Goodale saw any different version than the jury saw, and there was no evidence that any other version was more clear in any event." The security surveillance system records onto a hard drive. Videotape copies can be run off. One such copy was run off and shown to the jury. Before it was shown, the prosecutor told the jury that "the quality isn't very good." Officer Goodale watched the hard drive version. Whether or not the

17

videotape shown to the jury was less clear than viewing the hard drive is not a matter that can be resolved this court from this record. However, no one disagreed with the prosecutor's characterization of the videotape shown to the jury, and defense counsel in her argument called the tape "really hard to view." In the remarks now challenged, the prosecutor was only implicitly reiterating the same characterization of the videotape's quality.

But most importantly, the essential point of the prosecutor's argument was that the clothing on defendant depicted in the security camera system that Officer Goodale saw was the same clothing defendant was wearing at the Blue Heron motel. Defendant claims that because the videotape seen by the jury was "very small and of poor quality," making it "not possible to discern colors or clothing styles in it. . . . , Goodale's testimony that the clothing matched would have been unconvincing in the absence of the prosecutor's improper conduct." The credibility of Officer Goodale's testimony, and the weight to be given the videotape, were matters solely within the competence of the jury. Arguments to a reviewing court about whether a given witness's testimony is "unconvincing" are therefore misdirected, and do not establish misconduct.

The jury heard testimony from a Detective Wilcox that no usable fingerprints were recovered from the shotgun. The prosecutor argued that "We don't have any usable fingerprints on the weapon, not from the mysterious man who placed the object in the truck [according to Mr. Prado's testimony], not from Miss Upshaw, not from Mr. Seymore." Defendant contends that "while this statement is not inaccurate, it is misleading in that it implies that the shotgun was analyzed for Holly's and the other man's fingerprints. However, Detective Wilcox testified that he had tried to match the latent print only with appellant's fingerprints." If the prosecutor's argument was not factually inaccurate, any defects should have been shown by counterargument.

The same conclusion largely applies to the remaining instances of alleged misconduct. Apart from undermining his position by accusing the prosecutor of "fail[ing] to acknowledge that there was conflicting evidence," the cited instances involve minor matters of collateral significance, i.e., whether defendant and Upshaw argued

18

before she left the Blue Heron for the Texaco station, whether they argued about methamphetamine.

Finally, as for misrepresenting Luis Prado's testimony as to when and where the shotgun was planted in defendant's truck, the prosecutor was simply arguing from Prado's evidence that on the afternoon of February 24—which would obviously be before the incident at the Texaco—he saw an unnamed man enter defendant's truck and "mess with the seat," and then leave, no longer carrying the "something under his coat." Reasonable inferences, fair comment—not misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 819; *People v. Dennis* (1998) 17 Cal.4th 468, 522.)

## No Prejudicial Error Occurred In The Failure To Instruct The Jury On Accomplice Testimony

The other instance identified by defendant as a failure by the trial court to fulfill its sua sponte duty to instruct the jury on principles of law openly connected with the case (*People v. Koontz*, *supra*, 27 Cal.4th 1041, 1085; *People v. Estrada*, *supra*, 11 Cal.4th 568, 574), is whether Upshaw was defendant's accomplice.

"A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.) Defendant contends that Upshaw met this definition of accomplice, thus requiring the trial court to instruct that her testimony required corroboration and should be viewed with caution. (See *People v. Williams* (2010) 49 Cal.4th 405, 455; CALCRIM Nos. 334, 335.)

Defendant was charged with a violation of former Penal Code section 12020, which prohibited "[a]ny person in this state" from possessing "any short-barreled shotgun." The element of possession is not onerous to prove: "Possession may be actual or constructive. Actual possession means the object is in the defendant's immediate

19

possession or control. A defendant has actual possession when he himself has the weapon. Constructive possession means the object is not in the defendant's physical possession, but the defendant knowingly exercises control or the right to control the object. [Citation.] Possession of a weapon may be proven circumstantially for even a limited time and purpose may be sufficient. [Citation.]" (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 831.)

Upshaw testified that she saw the shotgun for the first time the day before the dispute at the Texaco station, when she "helped to make the handle." Upshaw described the weapon as being "in both of our possession." This would seem to constitute possession "for even a limited time and purpose," thus making her liable for the same offense for which defendant was being tried. The prosecutor seems to have agreed: "I didn't know Miss Upshaw was going to say that it was jointly their shotgun. Certainly, if it's jointly their shotgun, *she's equally guilty*." (Italics added.) With Upshaw established as an accomplice, the trial court was required to instruct the jury on the principles of accomplice testimony, even without a request by the defense. (*People v. Najera* (2008) 43 Cal.4th 1132, 1136-1137.) The Attorney General concedes that the instruction ought to have been given, but that this omission qualifies as harmless. We agree.

"Error in failing to instruct the jury on consideration of accomplice testimony at the guilt phase of a trial constitutes state-law error, and a reviewing court must evaluate whether it is reasonably probable that such error affected the verdict. [Citation.] [¶] Any error in failing to instruct the jury that it could not convict defendant on the testimony of an accomplice alone is harmless if there is evidence corroborating the accomplice's testimony. ' "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." ' [Citation.]" (*People v. Williams*, *supra*, 49 Cal.4th 405, 456.) "The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.)

20

Here, there was corroboration of Upshaw's testimony. To Officer Goodale she described the vehicle defendant was driving and its destination. Goodale verified this information when he found defendant and the described vehicle at the motel Upshaw identified. It seems fair to presume that the security videotape of the Texaco further corroborated Upshaw's description of the pickup defendant was driving. When Officer Goodale inspected defendant's vehicle and found the shotgun, this too corroborated Upshaw's description of it as "sawed-off." The stock of the shotgun appeared to be hand-made, which corroborated Upshaw's testimony that "I helped make the handle . . . out of a piece of wood." It also had some duct tape on the stock, just as Upshaw testified was added by defendant. Further corroboration was that defendant was wearing the same clothing depicted on the security videotape, which Goodale saw before going to the Blue Heron motel. In sum, although it was error not to instruct the jury on viewing Upshaw's testimony as that of an accomplice, the error was not prejudicial. (Cal. Const., art. VI, § 13; *People v. Williams*, *supra*, 49 Cal.4th 405, 459.)

This conclusion also dooms defendant's contention that contends his trial counsel was constitutionally incompetent because she did not "request instructions on accomplice testimony principles."

**DISPOSITION**

The judgment of conviction is affirmed.

21

_____
Richman, J.

We concur:


_____
Haerle, Acting P.J.


_____
Lambden, J.

Using the transcript of the conversation between Ms. Upshaw (U)and the 911 dispatcher (D), the relevant portions, with appropriate editorial changes, read as follows:

"D: What's Your name?
"U: My name is Holly Upshaw.
"D: Holly, what's going on there?
"U: I don't know.
"D: Do you know who that person [the one Thom described as having 'backed up and slammed into her car'] was?.
"U: Yeah.
"D: What's his name?
"U: I don't want to get him caught up in that 'cause that will get him even more mad.
"D: Okay, well what's going on today?
"U: he's demanding money from me that I don't have.
"D: Okay, do you need police assistance?
"U: I don't know.
"D: Are you injured?.
"U: No, I'm not . . . . Everybody knows I am pregnant.  He keeps coming after me.
"D: Okay, do you want to speak with a police officer?
"U: I don't know.  I guess.
"D: Okay, where can an officer contact you at?
"U: At the gas station.  [¶] . . . [¶] I'll be right here.
"D: Okay and what's his name, Holly?
"U: William Seymore.
"D: Okay, and what color is his vehicle?
"U: It's a blue Chevy pickup.
"D: Do you know where he is going?
"U: Probably back to the Blue Heron.
"D: What room does he stay in?
"U: He doesn't stay in any of them.
"D: He what?
"U: He stays in the parking lot.
"D: Okay, does he have any weapons on him?
"U: Yeah, he has a sawed-off shotgun in the back of the truck . . . [¶] . . . [¶]under the back seat.  Under the back seat in a plastic box.
"D: Did you see it today?
"U: No, I saw it yesterday. [¶] . . . [¶]
"D: Okay, did you see a firearm today?

23

"U:  No, I didn't, but I know he has it.  But he can't know that I told you or he will kill me.

"D:  And how much money do you owe him?

"U:  I don't owe him anything.

"D:  How much does he think you owe him?

"U:  I don't know.

"D:  Okay.  And what color is your vehicle?

"U:  I drive a red Nissan Maxima.

"D:  Are you going to be standing by for all the officers in you vehicle?

"U:  Yeah.

"D:  Okay, we will get them out there.  Just call me back if he returns, okay?

"U:  Okay."